[Cite as *In re G.G.*, 2013-Ohio-3991.]

STATE OF OHIO, COLUMBIANA COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| IN RE: | ) | CASE NO. 12 CO 6 |
| | ) | |
| G.G. | ) | |
| | ) | OPINION |
| | ) | |
| | ) | |

| | |
|---|---|
| CHARACTER OF PROCEEDINGS: | Civil Appeal from the Court of Common Pleas, Juvenile Court, of Columbiana County, Ohio Case No. J2004-0100-5 |
| JUDGMENT: | Affirmed. |
| APPEARANCES: | |
| For Plaintiff-Appellee: | Atty. Robert Herron Columbiana County Prosecutor Atty. Allyson Lehere Assistant Prosecuting Attorney 105 South Market Street Lisbon, Ohio 44432 |
| For Defendant-Appellant: | Atty. Donna J. McCollum 201 E. Commerce Street, Suite 346 Youngstown, Ohio 44503 |

JUDGES:

Hon. Cheryl L. Waite
Hon. Gene Donofrio
Hon. Joseph J. Vukovich

Dated: September 13, 2013

WAITE, J.

{¶1} Appellant Tiffany Dellapenna-Moore appeals the judgment of the Columbiana County Court of Common Pleas, Juvenile Division, permanently terminating her parental rights over her minor child, G.G. The child originally came under the jurisdiction of the juvenile court as a neglected child in 2004 at the age of five, and was involved again in 2008. At the time of the final hearing, G.G. was 13 years old. During the seven years that G.G. has been under the care of the Columbiana County Department of Jobs and Family Services ("CCDJFS"), Appellant had only sporadically visited the child, allowed an abusive husband to have contact with the child in violation of court orders, failed to participate in counseling, and failed to provide a safe living environment for the child. Appellant also was violent, and was charged with domestic violence three times. She was serving a period of probation for a domestic violence conviction at the time of the final hearing. Appellant also suffers from multiple mental health problems. She herself admitted that she could not adequately provide for the child. After a full and fair hearing, at which Appellant was represented by counsel, the court decided to end the seven-year attempt to reunify Appellant and G.G., and granted permanent custody of the child to CCDJFS. The judgment of the trial court is fully supported by the record, and the judgment is affirmed.

## History of the Case

{¶2} G.G. is the natural child of Appellant. G.G.'s natural father is deceased. Appellant is married to Charles Moore. A juvenile court complaint was filed on March 30, 2004, naming G.G. as a neglected child. The court adjudicated G.G. as a

neglected child, and the child was placed in the custody of Appellant under the protective supervision of the CCDJFS. A case plan was established. The goal was for Appellant to maintain custody.

{¶3} On August 13, 2004, a second complaint was filed, alleging that neglect occurred when Appellant overdosed on illegal drugs while the child was present. Appellant was represented by counsel at the adjudicatory hearing, and she stipulated to the finding of neglect. The court placed the child in the temporary custody of the child's maternal grandparents. The child was scheduled for counseling for aggressive, disruptive and violent behavior, and was placed on medication.

{¶4} For the next two years Appellant made some progress with the case plan and with attempted reunification with G.G. On July 20, 2006, a phased-in reunification of G.G. and Appellant was granted, and G.G. was again placed in Appellant's home under the protective supervision of CCDJFS.

{¶5} On August 21, 2008, the state requested that G.G. be removed from Appellant's home because she was allowing Charles Moore into the home despite a court order that Moore have no contact with Appellant and her children. G.G. was observed on numerous occasions with bruises around his face and neck. The state also argued for immediate removal of all of the children living with Appellant due to her arrest on an outstanding warrant and due to the condition of her home. A hearing was held on October 23, 2008. The court granted the emergency order and all of the children were sent to appropriate placement. (10/30/08 J.E.) On October 24, 2008, the court found that two more of Appellant's children, B.M. and J.M., were dependent children, primarily due to Appellant's incarceration. (10/31/08 J.E.) The

court also found that Appellant regularly ignored orders from East Liverpool Municipal Court and the juvenile court regarding prohibited contact between Appellant, her husband Charles Moore, and her children. The evidence at the hearing revealed that Moore was often seen at Appellant's home or with G.G. The court also found that Appellant struggled with basic everyday tasks of life such as keeping appointments for G.G., maintaining transportation, and keeping prescriptions filled. The court placed G.G. into the temporary custody of Angela Morris. (11/3/08 J.E.)

{¶6} On September 11, 2008, G.G.'s father died. He had not attended any hearing and had not participated in the case plan prior to his death.

{¶7} Over the next two years it became difficult to place G.G. in a foster home due to the child's aggressive and violent behavior. In November 2008, the child was placed in Belmont Pines Hospital due to a violent outburst while in therapy.

{¶8} On August 23, 2009, criminal complaints were filed against G.G. for violence at school, biting the principal, threatening to kill a teacher, and threatening to put a bomb in the school. G.G. was adjudicated delinquent for assault, vandalism and resisting arrest.

{¶9} Throughout the year 2009, reports were made to local authorities regarding Appellant's harassing behavior, thefts, and substance abuse. During that same year, there were also multiple hearings attempting to reunify Appellant and G.G. After a hearing on October 22, 2009, G.G. was placed for in-patient treatment at New Horizon Youth Center ("New Horizon") in Bethesda, Ohio. Appellant was ordered to cooperate with New Horizon and to take part in any counseling or rehabilitative treatment offered by New Horizon.

{¶10} During G.G.'s treatment at New Horizon, Appellant's participation became less and less frequent until her only contact with G.G. was by telephone.

{¶11} On February 1, 2010, the state filed a motion for permanent custody of G.G. and Appellant's three other children. The motion alleged that Appellant had not followed or completed her case plan and that the father was deceased. At this point, the case plan had been amended 22 times and included requirements that Appellant learn to communicate and interact with others without becoming violent and aggressive, to not use violence against or speak angrily to G.G., provide for all the basic needs of the child, maintain a safe and stable home, attend all of G.G.'s school meetings and doctor appointments, sign any necessary releases, visit G.G. at least once a week, attend counseling with Amy Frampton and Dr. Kaza for stress, take medications to deal with her bipolar disorder and ADHD, learn and be able to articulate appropriate non-violent ways to deal with her stress, submit to random drug tests, use only prescribed medications in the method and dosage prescribed, not allow drug dealers and drug users in her home, and participate in any treatment sought by New Horizon. (11/3/09 Case Plan.)

{¶12} The hearing on the motion for permanent custody was postponed four times before being dismissed for violating the time requirements for resolving a permanent custody motion. A new motion was filed on June 15, 2011. The final hearing on the motion took place on October 4, 2011. Appellant and G.G. were both represented by counsel at the hearing. Testimony was given by Roger Smith (G.G.'s guardian ad litem), Patty Allen (a therapist at New Horizon, and G.G.'s individual therapist from April 2010 until July 2011); Christian Bachochin (a caseworker at

CCDJFS), and Don Croskey (a friend of Appellant). Appellant also testified. The record indicates that there were no appropriate relatives that were suitable for permanent placement of G.G. The court granted CCDJFS's motion for permanent custody on January 25, 2012, terminating Appellant's parental rights and granting permanent custody of G.G. to the agency. Appellant's assignments of error are all related to whether the evidence at the final hearing supports the trial court's decision, and thus, they will be treated together.

<u>ASSIGNMENTS OF ERROR 1, 2 AND 3.</u>

The trial court committed reversible error by concluding there was clear and convincing evidence that the agency had provided reasonable efforts to assist Appellant to remedy the conditions that had caused the removal of the child and promote reunification of the family.

The trial court committed reversible error in granting permanent custody against the manifest weight of the evidence.

The court committed reversible error in failing to consider the factors set forth in R.C. 2151.414(D).

**{¶13}** Appellant argues in a number of ways that the facts do not support the court's decision to terminate her parental rights. Appellant does not believe that CCDJFS made reasonable efforts to reunite her with her child, and disagrees with the factual conclusions arrived at by the trial court. Appellant believes that she adequately participated in counseling, was not given sufficient help in obtaining transportation, was compliant with visitation and communication requests with G.G.,

was not taking unlawful or unprescribed drugs, and was managing her mental health problems. Appellant submits that the trial court failed to consider the factors relating to the best interest of the child found in R.C. 2151.414(D). However, none of Appellant's arguments are substantially supported by the record.

**{¶14}** Natural parents have a "fundamental liberty interest * * * in the care, custody, and management" of their children that is protected by the Fourteenth Amendment of the United States Constitution. *Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). "[A] court exercising Juvenile Court jurisdiction is invested with a very broad discretion, and, unless that power is abused, a reviewing court is not warranted in disturbing its judgment." *In re Anteau*, 67 Ohio App. 117, 119, 36 N.E.2d 47, 48 (6th Dist.1941). "The term 'abuse of discretion' connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable * * *." *In re Jane Doe 1*, 57 Ohio St.3d 135, 137, 566 N.E.2d 1181, 1184 (1990), citing *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144, 148-149 (1980). A juvenile court's decision to terminate parental rights and transfer permanent custody of a minor child must be supported by clear and convincing evidence. *Santosky*, *supra*, paragraph three of the syllabus. "Clear and convincing evidence is that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established. It is [an] intermediate [standard], being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases. It does not mean clear and *unequivocal.*" (Emphasis sic). *Cross v. Ledford,* 161 Ohio St. 469, 477, 120 N.E.2d 118 (1954).

**{¶15}** When reviewing the decision of a juvenile court to determine whether it is supported by clear and convincing evidence, "a reviewing court may not as a matter of law substitute its judgment as to what facts are shown by the evidence for that of the trial court" because the "trial judge, having heard the witnesses testify, was in a far better position to evaluate their testimony than a reviewing court." *Id.* at 478, 120 N.E.2d 118. "Where the evidence is in conflict, the trier of facts may determine what should be accepted as the truth and what should be rejected as false." *Id.* "Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978), syllabus.

**{¶16}** A public or private child-placement agency may file a motion under R.C. 2151.413(A) to request permanent custody of a child after a court has committed the child to the temporary custody of the agency. After the motion for permanent custody is filed, R.C. 2151.414 sets forth the procedures a juvenile court must follow in determining whether or not to grant the motion. *In re C.W.*, 104 Ohio St.3d 163, 2004-Ohio-6411, 818 N.E.2d 1176, ¶9. The juvenile court may grant permanent custody of a child to an agency if the court determines, by clear and convincing evidence, that it is in the child's best interest and that one of the conditions found in R.C. 2151.414(B)(A) applies. According to R.C. 2151.414(B)(1), the court may grant permanent custody of a child to the agency if the child was in the temporary custody of CCDJFS for 12 or more months of a consecutive 22-month period, and if it is in the best interest of the child:

(B)(1) Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:

* * *

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.

{¶17} Pursuant to R.C. 2151.414(B)(1)(d), once it is clear that the child has been in the care of the agency for at least 12 of the previous 22 months, the only matter to be determined by the trial court is the best interest of the child. *In re C.R.*, 7th Dist. No. 06 BE 53, 2007-Ohio-3179, ¶34. The best interest of the child, in this context, is governed by R.C. 2151.414(D)(1):

(D)(1)   In determining the best interest of a child at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) or (5) of section 2151.353 or division (C) of section 2151.415 of the Revised Code, the court shall consider all relevant factors, including, but not limited to, the following:

(a)   The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b)   The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c)   The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;

(d)   The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e)   Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

**{¶18}** R.C. 2151.414(E)(7)-(11) contains the following factors relevant to the best interest of the child:

(7)   The parent has been convicted of or pleaded guilty to one of the following:

(a)   An offense under section 2903.01, 2903.02, or 2903.03 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to an offense described in those sections and the victim of the offense was a sibling of the child or the victim was another child who lived in the parent's household at the time of the offense;

(b)   An offense under section 2903.11, 2903.12, or 2903.13 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to an offense described in those sections and the victim of the offense is the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense;

(c)  An offense under division (B)(2) of section 2919.22 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to the offense described in that section and the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense is the victim of the offense;

(d)  An offense under section 2907.02, 2907.03, 2907.04, 2907.05, or 2907.06 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to an offense described in those sections and the victim of the offense is the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense;

(e)  A conspiracy or attempt to commit, or complicity in committing, an offense described in division (E)(7)(a) or (d) of this section.

(8)  The parent has repeatedly withheld medical treatment or food from the child when the parent has the means to provide the treatment or food, and, in the case of withheld medical treatment, the parent withheld it for a purpose other than to treat the physical or mental illness or defect of the child by spiritual means through prayer alone in accordance with the tenets of a recognized religious body.

(9)  The parent has placed the child at substantial risk of harm two or more times due to alcohol or drug abuse and has rejected treatment two or more times or refused to participate in further treatment two or more times after a case plan issued pursuant to section 2151.412 of the Revised Code requiring treatment of the parent was journalized as part of a dispositional order issued with respect to the child or an order was issued by any other court requiring treatment of the parent.

(10)  The parent has abandoned the child.

(11)  The parent has had parental rights involuntarily terminated with respect to a sibling of the child pursuant to this section or section 2151.353 or 2151.415 of the Revised Code, or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to those sections, and the parent has failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child.

**{¶19}**  It is clear from R.C. 2151.414(D)(1), that the court may use any factors it considers to be relevant when determining the best interest of the child, and it is not limited solely to the statutorily enumerated factors.

**{¶20}**  Appellant contends that the court should have made findings regarding all 16 factors listed in R.C. 2151.414(E) in deciding whether to terminate her parental

rights.  The full set of factors in R.C. 2151.414(E) actually have to do with the court's determination as to "whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents".  This issue is only relevant if the motion for permanent custody was filed pursuant to R.C. 2151.414(B)(1)(a), which states:

> (B)(1)  Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if * * *:

> (a)  *The child* is not abandoned or orphaned, *has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period*, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, *and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.* (Emphasis added.)

{¶21} In the instant case, CCDJFS filed its motion for permanent custody pursuant to R.C. 2151.414(B)(1)(d).  This statutory section does not require the court to find that the child cannot be placed with the child's parents within a reasonable

time. R.C. 2151.414(B)(1)(d) requires the court to find that G.G. had been in the temporary custody of CCDJFS for 12 of the past 22 months, and that granting permanent custody to CCDJFS was in the best interest of the child.

**{¶22}** Appellant's focus on "reasonable efforts" is also misplaced in this appeal because the Ohio Supreme Court has held that when the matter has been filed under R.C. 2151.413 and 2151.414, a trial court does not need to make a "reasonable efforts" determination at the final permanent custody hearing so long as the court has made a "reasonable efforts" finding at some point after the child came under the temporary care of the agency. *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶4, 42; *accord*, *In re J.J.F.*, 5th Dist. No. 2009-CA-00133, 2009-Ohio-4736, ¶26. The "reasonable efforts" determination in this case had already been made more than one time while G.G. was under the care of CCDJFS. (10/31/08 Magistrate's Order; 2/2/09 Magistrate's Order; 3/26/10 Magistrate's Order).

**{¶23}** Appellant's arguments on appeal, particularly in the first assignment of error, are mainly directed at the question of whether reasonable efforts were made to reunite Appellant and G.G., but since that question was not properly under review in the R.C. 2151.414(B)(1)(d) permanent custody hearing, it does not provide a basis to find reversible error on appeal. *In re G.B.*, 10th Dist. No. 04AP-1024, 2005-Ohio-3141, ¶15; *In re Rodgers*, 138 Ohio App.3d 510, 741 N.E.2d 901 (12th Dist.2000); *In re Dyal*, 4th Dist. No. 01CA12 (Aug. 9, 2001); *In re K.W.*, 7th Dist. Nos. 11 BE 8, 11 BE 13, 2011-Ohio-6371.

**{¶24}** Even if "reasonable efforts to reunite the parent and child" were properly on review in this appeal, the record does reflect that reasonable efforts were

made to reunite Appellant and G.G. Appellant's case plan contained detailed goals for Appellant to achieve in order to effect reunification. CCDJFS worked towards reunification but Appellant's actions continually thwarted those efforts. Appellant failed to attend meetings or counseling, blamed CCDJFS or others for her failure to come up with transportation to required meetings, allowed contact between G.G. and Charles Moore when such contact was prohibited, and continued to speak and act violently towards G.G. and others. Her limited interaction with G.G. often resulted in the child having violent outbursts. She showed no signs that she had developed the necessary parenting skills to deal with G.G.'s own violent and troubled nature. She herself stated that she was not ready to take the child back. (Tr., pp. 133, 152.) The fact that she was arrested multiple times for domestic violence also interfered with visitation. One of the biggest problems with reunification was that contact between Appellant and G.G. was often detrimental to the child's mental and emotional health. The record indicates that CCDJFS made ongoing efforts to establish gradual reunification of Appellant and G.G., despite the many obstacles to reunification presented by both Appellant and G.G.

{¶25} Appellant's additional argument deals with the weight of the evidence with the respect to the best interest of the child. It is apparent that most of the factual errors alleged by Appellant in this appeal are contradicted by evidence in the record. For example, she contends that the court was wrong when it concluded that she was inconsistent with counseling and discontinued counseling contrary to the case plan. Yet, the record indicates the opposite. At one point, she had attended only six individual therapy sessions in four years. Appellant's counselor from CCDJFS

decided there was nothing more she could do because Appellant "was feeling * * * stress from working with our agency." (Tr., p. 61.) After Appellant and her CCDJFS counselor decided that CCDJFS counseling was the source of her anxiety, there was no point in continuing. Appellant was released from CCDJFS counseling in May of 2010, and has not attended any other individual counseling since that time. (Tr., p. 62.) The record does not reflect that she was relieved from her duty to attend any counseling. The record simply indicates that she had a specific problem with the CCDJFS counselor regarding her individual therapy. The record also reveals that she failed to consistently participate in family counseling.

{¶26} Appellant makes a similar argument with respect to her inability to come up with reliable transportation to visit her child, go to counseling, or go to any other meeting required by her case plan or by the court. She blames CCDJFS for not providing her with gasoline cards (a type of debit card that could be used only to purchase gasoline). An incident involving her misuse of a CCDJSF gasoline card is documented in the record. (Tr., p. 71.) She asked caseworker Christian Bachochin if her husband Charles Moore (with whom she was not supposed to have any contact) could use the card because he needed to get gas to go to work. When Bachochin said no, she immediately told Bachochin that she had "lost" the card. After that, she was not provided with another gasoline card. The fact that CCDJFS was not willing to have its benefits used improperly did not relieve Appellant of her responsibility to find transportation to counseling, to New Horizon, or to any other required meeting.

{¶27} Appellant contends that the court was wrong in concluding that she did not consistently exercise her companionship with G.G. She claims that she spoke to

her son almost daily, citing a report filed on March 11, 2011, prepared by Bachochin. The report was not entered into evidence or cited at the final hearing, but it is included in the trial court file. The report does not state that they had almost daily conversations. It states only that, as of February 24, 2011, the child tried to call Appellant on a regular basis. The evidence at the final hearing was that she was not always at home when G.G. called. The report also provides 11 pages of reasons for terminating her parental rights, including:

- descriptions of her many arrests and convictions for theft, domestic violence, menacing and disorderly conduct;

- her ongoing violent behavior, including vandalizing the emergency room at East Liverpool City Hospital because she did not like the treatment she was getting;

- her inability to maintain a residence due to failure to pay rent or for fighting with the other residents;

- the severe violent behavioral problems of G.G. that Appellant has no plan for dealing with;

- her mental health problems, including bipolar disorder and ADHD;

- her lack of attendance at therapy;

- her continued contact with her abusive husband, Charles Moore;

- her regular failure to appear at appointments for anything related to this case;

- her inability to engage in appropriate parenting skills;

- her refusal to take responsibility for her actions;

- her failure to participate in any treatment for G.G. at New Horizon;

- her abuse of the privilege of receiving gasoline cards;

- and the negative affect Appellant has on G.G. after their contact together.

{¶28} Rather than help her argument on appeal, this report provides clear and convincing evidence to support the permanent termination of Appellant's parental rights.

{¶29} Appellant is correct that some of the trial court's comments about her alleged misuse of illegal or prescription drugs are not conclusively established in the record. The trial court noted that she had tested positive for multiple drugs of abuse, that she had a history of prescription drug abuse, and that she abused street drugs and alcohol. It is not entirely clear on what evidence the court was relying in reaching these conclusions. There are numerous references in the record to Appellant's mental health issues and that she takes prescription drugs to control her bipolar disorder, ADHD, and depression. There are notes that she appeared drowsy and incoherent at times. There are indications that she allowed relatives to come into her home under the influence of drugs. There are notations about drug screenings and tests, but the results of those tests do not appear in the record. Bachochin testified that Appellant had satisfactorily dealt with her issues regarding misuse of her medication. (Tr., p. 64.) Even if there are indications that Appellant had problems with legal or illegal substance abuse in the past, she is correct that there was no clear and convincing evidence of this presented at the final custody hearing.

{¶30} Despite our conclusions regarding the trial court's finding as to Appellant's alleged drug abuse, the other evidence supporting the trial court's

decision to terminate Appellant's parental rights is overwhelming. Roger Smith, who had been G.G.'s guardian ad litem for a few years, testified that the child's anger issues worsened after contact with Appellant. He testified that Appellant's parental rights had been terminated over some of G.G.'s siblings. (Tr., pp. 9-10.) He testified that he could not state whether Appellant had progressed in her case plan because she had not contacted him for over a year. He recommended the permanent termination of Appellant's parental rights and placement of G.G. with CCDJFS.

{¶31} Christian Bachochin testified that Appellant had only attended counseling six times in four years. He testified that Appellant failed to sign the releases needed for him to obtain information about G.G.'s case. He testified that he was concerned about Appellant's ongoing police record, including a domestic violence arrest in 2010 involving Charles Moore where the charges were reduced to disorderly conduct. Appellant was on probation from that conviction at the time of the final hearing. Bachochin was concerned that Appellant only had an income of $650 per month from disability, and that $500 of that was used to pay her rent. Bachochin noted Appellant's failure to attend any family therapy sessions, and her misuse of the gasoline card. Bachochin testified that Appellant was inconsistent with visitation prior to the time G.G. was admitted to New Horizon, made no family therapy visits with G.G. at New Horizon, and that she was inconsistent in making herself available for phone conversations with the child. Bachochin testified that G.G.'s behavior improved after the court ordered that the child have no contact with Appellant for a period in May, 2011.

**{¶32}** Patty Allen, who was G.G.'s therapist at New Horizon, testified that Appellant made excuses why she could not participate in family counseling, and that Appellant never attended family counseling with her. Allen said Appellant visited G.G. only sporadically. She testified that G.G. would have negative behavioral and emotional reactions after talking with Appellant on the phone, but did not experience these negative reactions after talking with his grandmother or other visitors. Allen testified that Appellant was giving G.G. information during those phone calls that undermined his therapy and mental health. She testified that all contact was eventually stopped in May of 2011 due to G.G.'s delinquency proceedings arising from his attack on a police officer. Allen noted that G.G. improved during the period that he was not permitted contact with Appellant. She testified that G.G. does not want to return home, and that the child is excited about the possibility of entering into a new family relationship.

**{¶33}** The record indicates that G.G.'s interaction with Appellant was generally negative, even though it was generally positive with other visitors. There is evidence that G.G. expressed an interest in going to a new home and in not being reunited with Appellant. The custodial history indicates that the child has been in the care of the state from 2004 to 2006, and then continuously starting in 2008, resulting in the need to completely terminate contact between Appellant and G.G. in May of 2011. Attempts were made to place G.G. with other family members, to no avail. Appellant is correct that she did not fail in every aspect of her case plan, but her failures far outweighed her successes according to the trial court's interpretation of the evidence. This record contains clear and convincing evidence supporting the trial

court's decision to permanently terminate Appellant's parental rights over G.G., and the judgment of the trial court is affirmed.

Donofrio, J., concurs.

Vukovich, J., concurs.